UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                                     Chapter 11

      Mendel Paneth,                                      Case no.  22-41414

                              Debtor.
--------------------------------------------------------x
Kidline Enterprises Inc. and David Reiner,
                        Plaintiffs,

-against-                                                               Adv. Proc. No. 22-01076

Mendel Paneth,
                        Defendant.
--------------------------------------------------------x

## <u>MEMORANDUM IN SUPPORT OF DISCRETIONARY ABSTENTION</u>

           Kidline Enterprises Inc. ("Kidline") and David Reiner ("Reiner," with Kidline,

the "Plaintiffs"), as and for their memorandum in support of the entry of an order of abstention

on the issue of liability in the above-captioned adversary proceeding, respectfully represent:

**(a)** **The Debtor filed bankruptcy to avoid the day of reckoning in Rabbinical Arbitration for his and his spouse's looting of Kidline**,

**(b)** **The Supreme Court of Kings County ruled that the Debtor's dispute with the Plaintiffs, and three other disputes involving eight other parties arising from the same set of facts, must proceed in Rabbinical Arbitration,**

**(c)** **In the "interests of comity" and out of respect for the Supreme Court's arbitration order, this Court should abstain,**

**(d)** **This Court should abstain in the "interests of justice" on first amendment grounds since the parties agreed to Rabbinical arbitration under Jewish law,**

**(e)** **The interests of justice supporting Arbitration are further exemplified by the Federal Arbitration Act which enforces contractual arbitration provisions, and**

**(f)** **In addition to the general statutory interests of comity and justice, the judicial twelve-factor test typically applied supports permissive abstention.**

## **BACKGROUND**

### (a) The Debtor filed bankruptcy to avoid the day of reckoning in Rabbinical Arbitration for his and his spouse's looting of Kidline

1.      The Debtor recounts that he started in this country as a struggling immigrant Hebrew school teacher with graphic arts talent and a dream of writing comic books for ultra-orthodox children.  Reiner agreed to finance the Debtor's dream under a written partnership agreement ("Partnership Agreement," Exhibit A to Lift Stay Motion, Dkt. no.33). The Debtor arranged for preparation of the Partnership Agreement with almost no involvement by Reiner.  Local Rule Affidavit, pp. 1-2.  Debtor Afft. Dkt no.  44, p. 1-2.

2.      The venture was a success.  In short order, the Debtor was earning a big salary and bought a luxury home for his family.

3.      It was not enough.  With success, came resentment.  The Debtor thought it was unfair that Reiner earned profits and controlled finances, while the Debtor and his spouse were doing all the editing and publishing work.  Debtor Afft. Dkt no.  44, pp. 3-4.  In the Debtor's words, he and his spouse were "indentured slaves."  Richmond County Aff. ¶ 14, p3, attached as Exhibit A to Conversion Objection, Dkt. no. 64.  As stated by Suri Paneth, "He placed himself in President aka big boss vs worker position rather than partner relationship." Suri Paneth Afft., dkt. No. 57 p. 2.

4.      The Paneths used self-help to right this perceived wrong.

5.      In his lift stay motion ("Lift Stay Motion" dkt 33) and his reply ("Reply" dkt. 59) to the Debtor's objection to the Lift Stay Motion, incorporated by reference herein, Reiner documented with bank statements, copies of contracts and photographic evidence, the

Debtor's and Suri Paneth's subsequent looting, including Lincoln Navigator lease payments (exhibit H to Lift Stay Motion), personal loan payments (exhibit I to Lift Stay Motion), credit card payments (exhibit J to Lift Stay Motion), payments of family loans (exhibit k to Lift Stay Motion), personal legal bills (exhibit L to Lift Stay Motion), spouse's legal bills (exhibit N to Lift Stay Motion), start-up funds for Hundred (exhibit O to Lift Stay Motion), conversion of computer equipment (exhibit P to Lift Stay Motion), conversion of subscription list (exhibit Q to Lift Stay Motion), conversion of office space (exhibits R and S to Lift Stay Motion), payment of many personal expenses (exhibit C to Reply), conversion of intellectual property (Exhibit E to Reply) and conversion of office furniture (exhibit F to Reply).

6.      In addition to self-help, the Debtor also started Rabbinical arbitration ("Rabbinical Arbitration") and selected Rabbi Bergman as arbitrator ("Rabbinical Arbitrator"). As the Debtor stated in the Local Rule Affidavit at paragraph 30, p.5: "I did not want to create a war between us, but rather, consistent with the provision in our Partnership Agreement, sought rabbinical assistance to resolve our problems consistent with Jewish Law, in a simple, short and economical fashion. . ." *See* Suri Paneth Afft., dkt. No. 57 p. 3.

7.      The Arbitration Agreement (Exhibit A to the Lift Stay Motion) states in the first paragraph that the Debtor and Reiner agreed to arbitrate all issues arising from the partnership agreement (referred to by reference), and all disputes and matters in "way connected or arising out of abovementioned controversy," the abovementioned controversy being Kidline and the partnership agreement.

8.      Since the disputes between the Debtor and Reiner arise out of Kidline and the Partnership Agreement, the plain language of the Arbitration Agreement covers all of the disputes.

9.      Early in the Rabbinical Arbitration, the Rabbinical Arbitrator ruled that the Debtor and Reiner should move forward with buy-out procedures.  Essentially each side bids to buy-out the other.  Local Rule Affidavit p. 6.  This is the customary Jewish Law means of implementing a business divorce.  The Rabbinical Arbitrator also indicated that the Partnership Agreement non-compete provisions would be enforceable post-buy-out.

10.     The Debtor was disappointed.  He felt entitled to ownership of Kidline outright, plus monetary damages.  The Rabbinical Arbitrator nonetheless instructed the parties to proceed with the buy-out process.[1]

11.     The Debtor then asserted undocumented and implausible embezzlement claims against Reiner.  He argued that his buy-out bid should be reduced to zero and that he is entitled to recover millions of dollars to boot.  He has since repeated the allegations in State Court and this Court.  Reiner has repeatedly disproved the allegations with bank records both in Arbitration and in this Court.  Reply Exhibits A and B.

12.     The Debtor also complained that in 2015 Reiner contracted for telephone, printing and computer services with unacceptable vendors.  Those allegations were also repeated in this Court and in the Richmond County Complaint, exhibit C to Lift Stay Motion; see Bankruptcy Schedules A-B, and Debtor's Richmond County Affidavit.

---

[1] As shown by the Debtor's subsequent Richmond County pleadings, the Debtor changed his story to fit his bias and corruption theory.  Despite the fact that the Debtor initiated the Arbitration, the Debtor stated that Reiner improperly initiated the process to force the Debtor into Arbitration and a buy-out: "David Reiner has never served us with notice of intent to arbitrate but now attempts to use arbitration to force us to enter into a buy-out agreement." Richmond County Aff. ¶, Exhibit A hereto.  Such dishonesty exemplifies the Debtor's approach both before and during this bankruptcy.

13.     The Arbitration was consequently consumed with vendor issues.  For example, the Debtor argued that Kidline could have paid then current printing prices all the way back to the beginning of Kidline.  Reiner showed that based on the prevailing state of technology and the quality and quantity of printing required, the prices paid were always at or below market.  After technology improved, and printing quantity grew, costs dropped.

14.     Similarly, there was no legitimate issue with the telephone or computer service.  The Debtor's problem was that by August 2020, the Paneths' self-help strategy had escalated to where the Paneths had replaced most vendors and locked Reiner out of the business.  They opened a new bank account to which Reiner they gave Reiner no access.  They cut off Reiner's remote access to the Kidline computer servers.  They physically locked him out by disabling his electronic key.

15.     But the Paneths could not get control of the telephone number.  Frustrated by Reiner's success in protecting Kidline's telephone number, in August 2020, Suri Paneth commenced a Kings County lawsuit against Tele Go, the carrier, Index no. 515628/2020.

16.     Until Suri Paneth's Kings County Court lawsuit against Tele Go, the Arbitration moved forward without Suri Paneth.  The Arbitrator knew that the Debtor had transferred his shares to his wife for no consideration in 2017.  But the Debtor insisted that the transfer was a formality, that he remained the real owner and that his wife was his "employee."  When the Debtor discovered that the non-compete would survive a buy-out, he changed his

story.  He said his wife was the real owner, he was the employee, and his non-compete was ineffective after the share transfer.[2]

17.    The Rabbinical Arbitrator thereafter requested, and Suri Paneth agreed, to participate in the Rabbinical Arbitration.  This Court should similarly question the propriety of Bankruptcy Court jurisdiction over the Kidline ownership dispute even though the Debtor disclaims ownership of Kidline shares.

18.    After many more Rabbinical Arbitration hearings during which the documentary evidence cited herein was reviewed, and after much argument and deliberation, the Rabbinical Arbitrator finally entered an interim award on October 1, 2020 finding that Reiner was a 55% Kidline shareholder, that the Paneths were 45% shareholder, and that the Paneths had improperly locked out Reiner.  The Rabbinical Arbitrator ordered the Paneths to restore Reiner's access to Kidline's premises, bank accounts, books and records and email.  ("Interim Award," Lift Stay Motion, Exhibit G).

19.    Days later, on October 5, 2020, the Paneths commenced the aforementioned Richmond County Supreme Court action seeking ownership of Kidline, millions of dollars of damages and emergency injunctive relief to unwind the Interim Award and stay further Rabbinical Arbitration.

20.    Seeing through the Paneth's misrepresentations, and applying New York law enforcing arbitration agreements, the Richmond County Supreme Court denied the demand

---

[2] As the Debtor stated in his Local Rule Affidavit in this Court: "The three-year covenant not to compete under the Partnership Agreement expired three years from the end of 2016 when Reiner made Sury the shareholder instead of me, thus, no later than the end of 2019, I became "a free agent".  Local Rule Affidavit, p. 10, para. 66.  Predictably, the Debtor implies that Reiner orchestrated the conveyance, but naturally, there was never a thought given to reversing it.

for injunctive relief.  Undeterred, Suri Paneth doubled down on the State Court litigation by filing two more Richmond County Supreme Court cases against the printer and IT vendor.

21.     For his part, the Debtor states he approached several other Rabbinical arbitrators seeking to remove the Arbitration from the Rabbinical Arbitrator.  Local Rule Affidavit, pp. 11-12.  They too enforced the agreement to arbitrate.

22.     The Paneths then stalled the Rabbinical Arbitration, largely disregarded the Interim Award and ran Kidline as if they owned it.  They used Kidline's bank account like an ATM machine as exemplified by Exhibit C to the Reply.

23.     Faced with so many litigation and Arbitration setbacks, in late 2020, the Paneths decided to close down Kidline, transfer its assets and open up under a new name. Hence, Hundred was conceived.

24.     Reiner has produced documentary evidence showing that except for the telephone number which Reiner protected, the Debtor successfully conveyed virtually all of Kidline's assets to Hundred for no consideration.  He transferred at least $423,624 in cash (Lift Stay Motion Exhibit O), took over the premises (Lift Stay Motion Exhibit R and S), carried off the furniture fixtures, and equipment (Lift Stay Motion, Exhibit P and Reply, Exhibit F), and took the subscription list and intellectual property (Reply, Exhibit E and Lift Stay Motion, Exhibit Q).

25.     In January 2021, the Debtor stopped publishing Kindline magazine, and in February 2021, the magazine was renamed Hundred magazine.  The Debtor boasted about the change in his final Kindline issue.  He said he had been planning the move "for many months

behind the scenes," Reply, Exhibit E, p. 2, that Kindline subscribers will receive Hundred instead of Kindline, *Id.* p. 6., and that Kindline story lines will continue in Hundred. *Id.* p. 9.

   **(b) The Supreme Court of Kings County ruled that the Debtor's dispute with the Plaintiffs, and three other disputes involving eight other parties arising from the same set of facts, must proceed in Rabbinical Arbitration**

   26.    By order dated April 8, 2021, Justice Loren Baily-Schiffman enforced the agreement to arbitrate and dismissed all four State Court actions.  (Lift Stay Motion, Exhibit W).

   27.    Suri Paneth appealed Judge Schiffman's decision and moved to enjoin Arbitration pending appeal.  The Appellate Division also enforced the agreement to arbitrate, and denied her motion.  She then dismissed her appeal.

   28.    After the Debtor stopped publishing Kindline, Reiner took over possession of what little the Debtor left behind, and began the slow and expensive work of rebuilding Kidline.  Eventually, the ultra-orthodox Jewish community turned against the Paneths.  Hundred could not compete.  The Debtor shut down Hundred magazine in May 2022.  Kindline continues to publish and is rebuilding circulation despite the litigation cloud.

   29.    The Debtor and Suri Paneth both explain that it is considered a "sin" in the ultra-orthodox Jewish community to use the secular courts instead of Rabbinical arbitration. Debtor Declaration, dkt. 44, para. 14; Suri Paneth Declaration, dkt 57, para. 8.  But the Paneths contend that the ostracism they experienced after filing several State Court lawsuits declaring that Rabbinical Arbitration is corrupt, is <u>not</u> the predictable consequence of their actions.  They contend it results from corruption, bias and racketeering, and have announced their intention to assert RICO allegations in this Court to prove it.

30.     Having burned his bridges to the ultra-orthodox community, and with nothing else to lose, on June 19, 2022 ("Petition Date"), the Debtor filed his Chapter 11 case, expressly to obstruct Rabbinical Arbitration over the Kidline shares (that he claims are solely owned by his wife).

31.     At the first meeting of creditors, when asked why this case was filed, Debtor's counsel stated that it was due to corruption and bias in Rabbinical Arbitration.

32.     In the Local Rule Affidavit, the Debtor repeated the bias and corruption narrative at paragraph 91 and 93 on page 14–15,

> I filed this chapter 11 case on June 19, 2022, one day before the scheduled continuation of hearings before the Arbitrator, Rabbi Moshe Bergman. I was forced to take this step because my good-faith participation in two rounds of "Religious" Arbitration was met with nothing other than bias and corruption. . . It is my intention to use this protected forum as a place from which I can peacefully strive to develop a new source of income to support my family, and where hopefully I may find assistance in obtaining an unbiased resolution of this seven-year business dispute with my former partner David Reiner.

33.     In his Affirmation opposing Reiner's motion to lift the stay, the Debtor explained further that his goal is to block Arbitration so he can litigate in the Bankruptcy Court:

> I need all this to be decided in this Court. I need justice. This arbitration which costed more than half a million cannot be an arbitration. I never signed any arbitration agreement regarding my company Kidline Enterprise Inc. I want a trial regarding my claims.

Debtor Afft. Dkt no.  44, para 42, p. 11 (highlighting added).

34.     Although Suri Paneth filed no bankruptcy petition, she assumes that since the automatic stay applies to her husband, it applies to her as well:

> The approximate amount owed is to me by David Reiner is $850,000.00 for my shares of 2021 and 2022 on top of all the stolen money, diverted money, assests

and for stealing from Kidline company.  We want justice. My family is being
abused in the name of religion and we have been threatened with punishment, if
we do not go back to be Rabbi arbitration. We need protection. We want the court
to decide our issues not a arbitrator.

Suri Paneth Afft., dkt. No. 57 p. 2, para. 9-10.


35.    There can be no dispute that the Debtor's bankruptcy was intended to
remove the shareholder Arbitration to this Court.  The Debtor conducts himself as shareowner as
exemplified by the quote above from his Affidavit calling Kidline "my company," and his
commencement of Rabbinical Arbitration in 2020.  But it is equally undisputed that in 2017, the
Debtor transferred his shares to his wife for no consideration, and Suri Paneth is not giving them
back.

36.    Having filed a Chapter 11 petition, the Plaintiffs were compelled to either
permit the Debtor to obtain a discharge of his obligations to the Plaintiffs or to file claims in this
Court, and the complaint herein objecting to discharge.

37.    As of the Petition Date, the Plaintiffs' claims were hotly disputed in the
Arbitration.  Many other parties are involved the Arbitration including Suri Paneth.  At Suri
Paneth's demand, the Arbitrator stayed the Arbitration as to all parties pending further order of
this Court.  The Plaintiffs therefore made their Lift Stay Motion seeking an order of this Court
permitting the Arbitration to proceed in total, or at least with respect to everyone except the
Debtor.  In the alternative, the Plaintiffs urge this Court to (a) abstain from deciding liability in
favor of Arbitration, and (b) following the Arbitration liability determination, to decide whether
the Plaintiffs' claims are dischargeable.

**(c)  In the interests of comity and out of respect for the Supreme Court's order referring the disputes to Rabbinical Arbitration, this Court should abstain from hearing the determination of liability**

38.    28 U.S.C. § 1334 (c)(1) states: "[n]othing in [Section 1334] prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

39.    "Comity is a general principle…which provides that a court should respect the order and judgments of other courts." *In re Briarpatch Film Corp.*, 281 B.R. 820, 829 (Bankr. S.D.N.Y. 2002) (internal citation omitted).  "Bankruptcy courts must respect the orders and judgments of State courts and cannot act as a court of review or appeal as to matters that have been decided by State courts with jurisdiction.") (internal citation omitted).

40.    Here, the Supreme Court heard the Debtor's and Suri Paneth's objection to continuing the arbitration and ruled against them.  For this reason alone, under principles of comity, this Court should abstain, and require the Debtor to go back to the Arbitration forum where the matter was pending pre-petition. *See In re Briarpatch Film Corp.*, 281 B.R. at 829-30.

41.    The Debtor has argued that this Court should disregard the Supreme Court finding that the Debtor agreed to arbitration and retry the issue.

42.    Not only comity, but the doctrine of collateral estoppel binds this court to the Supreme Court's finding that the parties agreed to arbitrate.  *E.g.*, *F.T. Mar. Servs. Ltd. v. Lambda Shipholding Ltd.*, 533 F. Supp. 3d 149, 156 (S.D.N.Y. 2021) (collateral estoppel bars relitigation of whether there is an arbitration agreement where (a) the identical issue was raised in an earlier proceeding; (b) the issue was actually litigated and decided in the previous

proceeding; (c) the party had a full and fair opportunity to litigate the issue; and (d) resolving the issue was necessary to support a valid and final judgment on the merits.)

43.     Here, all four collateral estoppel elements exist:  (a) the Kings County Supreme Court considered whether the parties agreed to arbitrate, (b) the issue was litigated under a motion to compel arbitration, (c) Corash & Hollender and Morrison Cohen LLP submitted opposition briefs and affidavits, and then filed an appeal which was dismissed voluntarily, and (d) resolution of whether an agreement to arbitrate exists was necessary to decide whether to refer the case to arbitration.

44.     The importance of comity is further exemplified by the Full Faith and Credit Clause in Art. IV, § 1 of the United States Constitution and its enabling statute, 28 U.S.C.A. § 1738, requires that "every court within the United States" give full faith and credit to the judicial proceedings of any "State, Territory, or Possession of the United States." *Exxon Mobil Corp. v. Saudi Basic Industries Corp*., 544 U.S. 280, 293, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005) ("The Full Faith and Credit Act,  28 U.S.C. § 1738, originally enacted in 1790, ch. 11, 1 Stat. 122, requires the federal court to 'give the same preclusive effect to a state-court judgment as another court of that State would give.'") (*quoting Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523, 106 S. Ct. 768, 88 L. Ed. 2d 877 (1986).

45.     Under the full faith and credit clause, as well as the *Rooker Feldman* doctrine, a state court order either compelling or denying arbitration must be given preclusive effect by a federal court.  *See, Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 447 (2d Cir. 1995) (reversing district order failing to give full faith and credit to state court order denying arbitration); *Se. Res. Recovery Facility Auth. v. Montenay Int'l Corp.*, 973 F.2d 711, 714 (9th Cir.

1992) (reversing district order failing to give full faith and credit to state court order compelling arbitration); *accord, Am. Reliable Ins. Co. v. Stillwell,* 336 F.3d 311, 317 (4th Cir. 2003).

    **(d) This Court should not take jurisdiction over these disputes in the interests of justice since they are governed by Jewish law**

    46.    The Arbitration agreement requires application of Jewish law.  In the "interests of justice," this Court is precluded from taking jurisdiction under the First Amendment of the United States Constitution.

    47.    Federal Courts may not assume jurisdiction where the parties agreed to apply religious law in a religious forum.  *See generally, Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 449, 89 S. Ct. 601, 606, 21 L. Ed. 2d 658 (1969); *Serbian Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 709, 96 S.Ct. 2372, 2380, 49 L.Ed.2d 151 (1976); *Jones v. Wolf,* 443 U.S. 595, 603, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775 (1979).

    48.    Here, the Arbitration Agreement states that disputes must be decided under Jewish law in Rabbinical Arbitration.  This may affect the outcome of certain disputes. For example, Reiner seeks a determination that Suri Paneth is holding her Kidline shares as nominee for the Debtor on Jewish law principles governing intrafamily transfers for no consideration and under Jewish law principles governing business customs in the community. The Arbitration, therefore, must move forward based on religious freedom principles.  *Garcia v. Church of Scientology Flag Serv. Org., Inc.*, No. 18-13452, 2021 WL 5074465, at *9 (11th Cir. Nov. 2, 2021); *See e.g.*, C*ongregation Yetev Lev D'Satmar v. Kahana*, 9 N.Y.3d 282, 849 N.Y.S.2d 463 (2007); *Accord, Russian Orthodox Convent Novo-Diveevo, Inc. v. Sukharevskaya*, 166 A.D.3d 1036, 1038, 91 N.Y.S.3d 101, 103 (2018); *Ming Tung v. China Buddhist Ass'n*, 124

A.D.3d 13, 996 N.Y.S.2d 236 (2014), *aff'd*, 26 N.Y.3d 1152, 48 N.E.3d 497 (2016); *Gen. Conf. of Evangelical Methodist Church v. Evangelical Methodist Church of *56 Dalton, Georgia*, 807 F. Supp. 2d 1291, 1294-95 (N.D. Ga. 2011); *Easterly v. Heritage Christian Sch.*, 2009 WL 2750099 (S.D. Ind. 2009). Predictably, case law under the Federal Arbitration Act upholds these First Amendment principles. *E.g. Garcia v. Church of Scientology Flag Serv. Org., Inc.*, 2021 WL 5074465 at *9.

49.     In summary, this Court should not take jurisdiction over these disputes in the interests of justice since they are governed by Jewish law.

**(e) The interest of justice supporting Arbitration are further exemplified by the Federal Arbitration Act which mandates the enforcement of contractual arbitration provisions**

50.     The interest of justice supporting Arbitration are further exemplified by the Federal Arbitration Act, 9 U.S.C. § 1, et seq. (the "FAA"), which provides that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. By its terms, the FAA "establishes a 'federal policy favoring arbitration agreements,' and mandates the enforcement of contractual arbitration provisions." *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 107 (2d Cir. 2000) (internal citations omitted) (*quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). In light of the "strong federal policy favoring arbitration, the traditional [*Sonnax*] balancing test . . . for seeking relief from the automatic stay does not apply." *In re Cardali*, 2010 WL 4791801, at *4. Rather, in applying the FAA to litigation in bankruptcy cases, courts undertake a four-part inquiry: (1) whether the parties agreed to arbitrate; (2) whether the dispute falls within the arbitration clause; (3) if federal

statutory claims are raised, whether Congress intended those claims to be arbitrable; and (4) if the court concludes that some but not all of the claims are arbitrable, whether it should stay the non-arbitrable claims pending the conclusion of the arbitration. See id. at *4–5 (collecting cases).

51.    Here, the parties agreed to arbitrate, as determined by the Arbitrator, the Supreme Court and the Appellate Division.  By the same token, by ordering arbitration, the Arbitrator, the Supreme Court and the Appellate Division all found that the claims against Movants and the Movants' claims against the Debtor fall within the arbitration.

*52.*    Procedurally, the issues may be "core" with respect to the Debtor upon the filing of proofs of claim.  But the claims arose ". . . from the parties' prepetition contractual relationship, were procedurally core only, and arbitration of the claims would not interfere with any bankruptcy policy."  *In re S.W. Bach & Co.*, 425 B.R. 78, 91 (Bankr. S.D.N.Y. 2010) *citing In re Hagerstown Fiber Ltd. P'ship,* 277 B.R. 181, 205 (Bankr. S.D.N.Y. 2002)

53.    In summary, since the Arbitration between the Debtor and the Movants (a) concerns claims that are core only by virtue of the Bankruptcy filing, (b) involves nine other non-debtor parties who must move forward in arbitration regardless (c) involves Jewish law and (d) may enhance the estate under Jewish law in ways that litigation in this Court could not, under Second Circuit authority compelling courts to err on the side of enforcing arbitration agreements, the interests of justice support abstention to permit the Arbitration to continue.

54.    The Debtor has argued that the arbitration agreements should be revoked under the Federal Arbitration Act ("FAA") "in law or equity" based on alleged corruption and unconscionably high fees.  In open court, Debtor's counsel equated sending the Paneths to Arbitration with send them to a holocaust concentration camp.  Presumably, the Debtor will make the same argument "in the interests of justice."

55.    The Debtor's arguments are fatally flawed as a matter of law because even if true, they apply to revocation of an arbitration award, not revocation of an arbitration agreement. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *see also Wick v. Atlantic Marine, Inc.,* 605 F.2d 166, 168 (5th Cir.1979). Since the Debtor alleged no grounds to revoke the specific provision in the Partnership Agreement requiring arbitration, the agreement to arbitrate must be enforced.[3]

56.    Alternatively, the Debtor will likely argue that since the Plaintiffs filed proofs of claim and a dischargeability complaint, the Bankruptcy Court is obligated in the interests of justice to decide those issues as core bankruptcy proceedings. But as noted above, those matters are pending in this Court only because the Debtor filed a bankruptcy petition. The underlying liability determination, as opposed to the dischargeability determination, implicates Jewish law and New York law, not bankruptcy law.

57.    In the context of the Plaintiffs' motion to lift the stay, the Debtor cited *In re Koper*, 516 B.R. 707 (Bankr. E.D.N.Y. 2014). In *Koper*, applying a case-by-case analysis, the Bankruptcy Court denied a motion to compel arbitration noting that, unlike here, the dischargeability complaint was trial ready in the Bankruptcy Court, so judicial economy favored a trial in the Bankruptcy Court. No prior state court order required arbitration. No agreement required application of Jewish law by a Rabbinical arbitrator. There was no two-year history of

---

[3] Incidentally, even in the context of revoking an arbitration award, the Debtor has alleged no credible example of unfairness. The Arbitrator made only one written ruling (Exhibit G to the Motion). It is beyond reproach. In the caption of the ruling, the Arbitrator found that Reiner owns 55% of Kidline shares the Paneths owns 45%. In the body of the ruling, the Arbitrator ordered the Paneth's to restore Reiner's access to Kidline's property and books records, and that future expenditures be subject to agreement by both the Paneths and Reiner. Under secular law, the rule is that when in doubt, tax returns determine corporate ownership. See Man Choi Chiu v. Chiu, 38 A.D.3d 619, 620-21, 832 N.Y.S.2d 89, 9192 (2d Dep't 2007); Capizola v. Vantage Int'l, Ltd., 2 A.D.3d 843, 844-45, 770 N.Y.S.2d 395, 396 (2d Dep't 2003); Rosin v. Schnitzler, No. 504136/15, 2018 WL 4466247, at *4 (Sup. Ct. N.Y. Cty Sep. 18, 2018).

arbitration proceedings.  The Bankruptcy Court noted that in other cases, it would be appropriate to grant a motion to compel arbitration.  Applying a case-by-case analysis here, the Movants respectfully submit that cause exists to compel arbitration.

58.     Much of the documentary evidence is in Hebrew.  In Rabbinical Arbitration, nothing will be lost in translation.  For example, the Debtor can argue in this Court that the sale of Nadler's Kidline shares was improper, only because the Debtor knows that the underlying sale document, signed by the Debtor, has not yet been translated.  Similarly, the Debtor argues that he and Suri were not consulted on disbursements, but many of the conversation between them that belie the statement were made by text or email in Yiddish.  Even for documents translated, nuance is lost.  As noted in the Lift Stay Motion, the translation of the title of the so-called "Partnership Agreement" is misleading because the contents of the agreement describe a joint venture agreement.[4]  The inaccurate translation opened the door to Debtor arguments in the secular courts that lack credibility in Rabbinical Arbitration.

59.     This case is further distinguishable from *Koper* since the arbitration involves so many non-debtor parties it must move forward with or without the Debtor.  In addition to the Debtor, the Supreme Court ordered the following parties to arbitrate claims by and among each other:  Reiner, Kidline, Suri Paneth, Yoel Klein, Tele Go Inc., Infinite Solutions NY Inc., Chaim Kohn, JCR Printing and Yossi Reiner.  Those claims are arbitrable, involve non-Debtors and not subject to being stayed.

---

[4] This Joint Venture Agreement is written in Hebrew. A literal translation of the document's heading is "Partnership Agreement."  However, it is, in fact, a joint venture with the agreement envisioning the creation of a corporation.  In Hebrew and Jewish law, joint ventures are generally referred to as "Partnerships." Hence, the agreement is called a Partnership Agreement although it is actually a Joint Venture Agreement.

60.     Although engaging in Arbitration and discharegability litigation will result in overlap, there will be less duplication here than in *Koper* because the Arbitration is well underway, but the dischargeability action is just starting.  Here, unlike *Koper,* the importance of enforcing the arbitration agreements outweighs the cost of duplicative litigation.

61.     In summary, under Second Circuit authority that compels courts to err on the side of enforcing arbitration agreements this Court should abstain from jurisdiction in the interests of justice since the Arbitration (a) concerns claims that are core only by virtue of the Bankruptcy filing, (b) involves nine other non-debtor parties who must move forward in arbitration regardless (c) involves Jewish law and (d) may enhance the estate under Jewish law in ways that litigation in this Court could not.

**(f)  In addition to the general statutory interests of comity and justice, the twelve-factor judicial test typically applied supports permissive abstention**

62.     In determining whether to exercise permissive abstention under § 1334(c) courts usually consider one or more (not necessarily all) of these twelve factors:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which [non-bankruptcy] law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable [non-bankruptcy] law, (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing [non-bankruptcy] law claims from core bankruptcy matters to allow judgments to be entered in [non-bankruptcy] court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtor parties.

*In re Portrait Corp. of Am., Inc.*, 406 B.R. 637, 641–42 (Bankr. S.D.N.Y. 2009).

63. Probably the best reason to abstain is the likelihood of forum shopping, which is closely related to comity. The Debtor was content to litigate the same facts and theories in Arbitration until, after months of litigation, the Debtor felt the tide turning against him. That triggered four complaints in the Supreme Courts of Kings and Richmond counties, all of which were dismissed and referred back to Arbitration. In desperation the Debtor filed a bankruptcy petition.

64. Both the Debtor and his lawyer have repeatedly admitted that the case was filed solely to avoid Arbitration. In similar circumstances, abstention is routine. *E.g. Osuji v. Fed. Nat'l Mortg. Ass'n*, 571 B.R. 518, 524 (E.D.N.Y. 2017); *Little Rest Twelve, Inc. v. Visan*, 458 B.R. 44, 60 (S.D.N.Y. 2011); *Portrait Corp.* 406 B.R. at 643; *In re Taub*, 417 B.R. 186, 197 (Bankr. E.D.N.Y. 2009).

65. The other relevant permissive abstention factors support the same result.

66. On the efficient administration of the estate, there is obviously a pending Arbitration and the Arbitrator already has a long learning curve. He has made at least one interim ruling and expressed his views on many of the facts and legal theories the parties have presented. But for the Debtor's Chapter 11 filing, Arbitration would likely be over by now. Either way, since the Arbitration was moving apace, whereas the Bankruptcy Court would have to start from scratch, efficient administration supports abstention. *Osuji* 571 B.R. at 522, *citing In re Int'l Tobacco Partners, Ltd.,* 462 B.R. 378, 393 (Bankr. E.D.N.Y. 2011)*; In re Bay Vista of Virginia, Inc.,* 394 B.R. 820, 844 (Bankr. E.D. Va. 2008) (collecting cases).

67. Moreover, by permitting the case to proceed in Arbitration on the issue of liability, the outcome may narrow or even preclude litigation over dischargeability.

68.     On the predominance of non-bankruptcy law issues, the Debtor and Plaintiffs agreed to resolve their disputes under Jewish law before a Rabbinical arbitrator.  In similar circumstances, the Bankruptcy Courts generally abstain.  *See, Taub,* at 193; *Oakwood Shopping Ctr., Ltd. P'ship v. Villa Enterprises of Midwest, Inc.*, No. CIV.A. 10-2758, 2011 WL 3350402 (E.D. La. Aug. 3, 2011); *see also In re Adelphia Commc'ns Corp.*, 285 B.R. 127, 146 (Bankr. S.D.N.Y. 2002).

69.     Indeed, this Court may lack Jewish law expertise so it may be difficult for this Court to rule on such issues.

70.     Regarding this Court's jurisdiction, Federal jurisdiction over the Debtor's liability to the Plaintiffs is implicated only because the Debtor filed a bankruptcy petition.  And this Court can simply sever the liability determination and defer the Bankruptcy Code based dischargeability determination.

71.     The Debtor filed this case to avoid the Plaintiffs' claims.  The Debtor has other large creditors.  Determination of the amount of the Plaintiffs' claims will not necessarily determine the outcome of the Debtor's bankruptcy.  Absent a subsequent finding by this Court that any such claim is nondischargeable, such claim may be discharged under a Chapter 13 plan.  Even if a liability determination would determine the outcome, that does not warrant hearing the dispute in Bankruptcy Court. The Debtor must show something more. *See, Stahl v. Stahl*, No. 03 CIV.0405 VM, 2003 WL 22595288, at *3 (S.D.N.Y. Nov. 7, 2003).

72.     The last relevant factor is the presence in the proceeding of non-debtor parties.  Here, the arbitration concerns not only claims by and between the Plaintiffs and the Debtor, but claims by and between the Plaintiffs and Suri Paneth, the Debtor's spouse.  Suri

Paneth has not filed a bankruptcy petition and the Claimants must proceed against her in arbitration.

73.      In addition to claims by the Debtor against Reiner, the Richmond County complaint filed by the Debtor, Suri Paneth and (without authorization of Kidline) made claims against Reiner and Yoel Klein for forfeiture of Reiner's Kidline shares, a declaration that actions taken by Reiner may not be enforced, and unspecified damages.  In the Kings County complaint against Tele Go Inc. filed by Suri Paneth and (without authorization Kidline) Ms. Paneth demand the following relief under New York law:  judgments based on tortious interference with contract, willful misconduct and gross negligence, breach of contract, injunctive relief compelling the Kidline telephone number to be released, injunctive relief enjoying recording conversations:  Similar claims were made in the Richmond County complaints against Infinite Solutions NY Inc., Chaim Kohn, JCP Printing and Yossi Reiner.  In these actions, the defendants have counter claims against Suri Paneth.  By order of the Supreme Court, these cases are now pending in the Arbitration, but stayed by the Arbitrator at Suri Paneth's request, pending further order of this Court.  The arbitration should therefore proceed under any analysis to avoid adjudication in two forums, and potentially inconsistent judgments.

## <u>CONCLUSION</u>

WHEREFORE, the Plaintiffs respectfully submit that it would be within the sound discretion of this Court to abstain from hearing the liability determination on Plaintiffs' claims, with this Court reserving jurisdiction over the dischargeability determination herein, and to permit the Arbitration to proceed for all other parties.

Dated:      New York, New York
            February 17, 2023

**BACKENROTH FRANKEL & KRINSKY, LLP**
Attorneys for the Plaintiffs


By:     <u>s/Mark A. Frankel</u>
        800 Third Avenue
        New York, New York 10022
        (212) 593-1100